THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COM- PANY v. LEON WATSON.

37  773
40  106
37  773
58  334

1. PROBABLE CAUSE — *Question for Court — for Jury, When.* In an action for malicious prosecution, the question of probable cause is primarily one for the court, but if the facts tending to establish the existence or want of probable cause are in dispute, then it is the duty of the court to submit the question to the jury.

2. EVIDENCE — *Jury — Facts, Grouped in Instructions.* It is generally the duty of the trial court in such a case, where there is a substantial dispute about the facts constituting the existence or want of probable cause, to submit the evidence to the jury, with instructions to determine its credibility and what facts are proved, and that the facts amount to proof of probable cause, or that they do not. The court should group the facts which the evidence tends to prove in the instructions, and tell the jury that if they find such facts have been established they must find that there was or was not probable cause.

3. CRIMINAL PROSECUTION — *Conduct of Complainant, How Weighed.* The conduct of a person who commences a criminal prosecution against another must be weighed in view of what then appeared to him to be the acts and declarations of the accused, and not in the light of subsequently appearing facts.

*Error from Shawnee Superior Court.*

ACTION to recover damages for a malicious prosecution, brought against *The A. T. & S. F. Rld. Co.* and *William Higgins,* in the superior court of Shawnee county. *Leon Watson,* the plaintiff below, was arrested at Topeka, on the 15th day of April, 1884, on complaint sworn to by William Higgins, an agent and employé of the railroad company, charging Watson with unlawfully, feloniously and willfully displacing a switch connected with the line of the railroad at Osage City, Osage county. Watson was taken to Osage county, and confined in the county jail from April 16 to May 3, 1884. The proceedings were dismissed by the county attorney of Osage county without a hearing, and the railroad company paid the costs. The defendant railroad company filed its answer, in which it alleged that the arrest was made strictly at the suggestion and request of the board of railroad commissioners. A copy of the cor-

respondence between the railroad company and the board of
railroad commissioners is attached to the pleadings, and is as
follows:

"TOPEKA, KANSAS, September 17, 1883.

"*Railroad Commissioners, Topeka, Kansas*— GENTLEMEN:
On September 1, an accident occurred on this road at Osage
City, caused by a brakeman by the name of Watson carelessly
and negligently throwing the switch. Watson has escaped.
If desired on your part, we will endeavor to effect a capture,
and turn him over to be dealt with according to law. An
early reply will greatly oblige. This accident resulted in the
fireman losing a leg, and severely bruising the engineer.

C. M. FOULKS, *Claim Agent.*"

"TOPEKA, KANSAS, Sept. 21, 1883.

"*C. C. Wheeler, Esq., General Manager A. T. & S. F. Rld.,
Topeka, Kas.*—DEAR SIR: We are in receipt of a letter from
C. M. Foulks, claim agent of your road, covering account of
an accident on your road at Osage City, on the 1st inst., caused
by brakeman Watson negligently throwing the switch in front
of an approaching train, occasioning severe injuries to the fire-
man and engineer; and further advising us that if desired on
our part an endeavor will be made to effect a capture of the
brakeman, who has escaped, to be turned over to us to be dealt
with according to law. Accidents of a similar nature have
heretofore occurred quite recently on your line from the same
cause, and in view of this fact we think it would have a salu-
tary effect to capture the absconding brakeman if possible, and
turn him over to the proper authorities to be held accountable
for his conduct. The courts in Osage county have jurisdiction
of the matter. Yours truly,

BOARD OF RAILROAD COMMISSIONERS."

Trial at the November Term, 1885. The court instructed
the jury as follows:

"1. This action was brought originally as an action for false
imprisonment and malicious prosecution. But the plaintiff
has dismissed so much of his petition as relates to the sup-
posed false imprisonment, and the plaintiff now bases his right
of recovery only on the ground of malicious prosecution as
alleged in his petition. It is admitted by the defendant Hig-
gins that he made the complaint alleged in plaintiff's peti-
tion, and the original of which complaint was read to you in
evidence, and it is admitted by the defendant the Atchison,

Topeka & Santa Fé Railroad Company, that it authorized, approved, and sanctioned the making of said complaint by said Higgins. The offense charged in said complaint against Leon Watson, the plaintiff in this action, is a crime of felony under the laws of this state; and if you believe from the evidence that defendants made said complaint, and caused the plaintiff to be arrested and prosecuted on said complaint, through malice, and without probable cause or reasonable grounds for so doing, and that such action or prosecution was finally ended before the commencement of this suit, then plaintiff is entitled to recover in this action.

"2. Notwithstanding the actual innocence of the plaintiff of the offense charged in said complaint, if you should so find from the evidence, and the further fact, if you should so find that defendants caused plaintiff to be arrested and prosecuted on such complaint from malicious or unworthy motives, and that plaintiff thereby sustained damages or injury in his reputation and person, he is without remedy therefor if defendants had just reason to believe, upon the facts and circumstances within their knowledge, that the plaintiff had committed the crime charged upon him. Probable cause is such state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, upon the facts and circumstances within his knowledge, and such reasonable representations, consistent with the guilt of the party accused, made to him by credible persons claiming to know the facts they represent, respecting the committing of such supposed offense, and honestly believed by him to be true, to believe that the person accused is guilty of the offense charged.

"3. Under the crimes act of this state, any person who shall willfully remove or displace any switch connected with the track of any railroad in this state is guilty of a crime, punishable by imprisonment in the penitentiary. But a mere accidental or ignorant displacement of any such switch is not a crime, nor punishable as such, even if done through negligence or carelessness.

"4. A man has no right to put the criminal law in motion against another, and deprive him of his liberty, upon mere conjecture that he has been guilty of a crime. He cannot be allowed to put a false and unreasonable construction on the conduct of another, and then justify himself for causing an arrest by claiming that he acted upon appearances.

"5. Before the plaintiff can recover in this case the jury

must be satisfied from the evidence introduced: First, that the prosecution was commenced by filing a complaint, and the issuance of a warrant thereon; second, that such complaint was made without probable cause therefor; third, that said complaint was filed and said warrant was procured maliciously, for the purpose of injuring the plaintiff; fourth, that the plaintiff was acquitted or discharged.

"6. The burden of proof rests on the plaintiff to establish, by a preponderance of testimony, every material fact charged in his petition and necessary to a recovery; and if in your opinion under the evidence he has failed to establish any one of such material facts, then your verdict must be for the defendants.

"7. The mere fact that the plaintiff was acquitted or discharged, or the further fact (if you shall believe from the evidence that is the fact) that the plaintiff was not guilty of the offense charged against him, will not authorize you to find a verdict for the plaintiff. You are not called upon to determine the plaintiff's guilt or innocence. The principal questions for your determination are, whether the prosecution against him was malicious and without probable cause.

"8. This action is prosecuted against both the railroad company and William Higgins. It is shown by the pleadings and by the testimony that said Higgins was the agent of the railroad company in instituting the prosecution complained of, and in carrying it on to its close. While such agency cannot release or excuse him from any wrongful or illegal act, if you shall find that his acts were wrongful or illegal, the fact of his agency as stated, as well as the acts of other agents as they may be proven, may be considered in determining the liability of the defendant railroad company. The defendant company, being a corporation, acts only by and through its officers, agents or servants. It is in law held responsible for the wrongful, unlawful and malicious acts of its officers, agents and servants, acting within the scope of their authority. Their acts in such cases are the acts of the company. In determining whether the defendant was actuated by malice or not in procuring the arrest and imprisonment of the plaintiff, you may take into consideration the acts of its agents, Foulks and Higgins, their opportunities to investigate and ascertain the connection of the plaintiff with the supposed offense charged against him, and any failure on their part, if any, to make the fullest investigation proper to be made before commencing judicial proceedings against the plaintiff. And if you shall

believe that there was want of probable cause for procuring the arrest and imprisonment of the plaintiff, you are at liberty to infer the malice of the defendant for such want of probable cause, if the same be reasonably inferable therefrom.

"9. Malice, in its popular sense, means hatred, ill-will, or hostility to another, but in its legal sense it has a very different meaning. In law, malice means a wrongful and unlawful motive or purpose; the willful doing of an injurious act without lawful excuse; and it is in this sense that the word malice is used in these instructions, except so far as respects the question of exemplary damages, of which you will be advised presently.

"10. If you believe that the plaintiff was arrested and imprisoned by the defendants upon mere guess, or that the proceedings taken against him were commenced recklessly, and without exercising that care and caution necessary to justify a prudent man in commencing a criminal prosecution against another, then I instruct you that the arrest and imprisonment were without probable cause.

"11. If you shall find for the plaintiff in this action, you may find against either or both of the defendants, as their liability shall be shown by the evidence.

"12. If you should find from the evidence that the defendants, or either of them, are liable, it will be your duty to consider the question of damages. Damages are distinguished as nominal, compensatory, and exemplary or vindictive. Where the legal right of a person is infringed, but no appreciable loss or injury is suffered, such person is entitled to recover some trifling sum at least; and that is known as nominal damages, for the law implies some damages for the infringement of every legal right. Where the violation of a legal right is accomplished by actual loss and injury, the sufferer is entitled to recover so much as will compensate him for all the loss and injury which flow directly from the illegal act; and this is known as compensatory damages. Where the illegal act for which redress is sought is not only tortious, but is dictated by malice or evil intent, or is attended with circumstances of intentional oppression, insult, or outrage, the law while it does not require yet permits a jury within its reasonable discretion to go beyond the measure of compensation, and award in damages such sum as they may deem just and proper by way of retribution for the wrong, and of example to deliberate wrongdoers: such damages are denominated as punitive, or exemplary, or vindictive damages.

"13. If you find for the plaintiff, it will be your duty to award him such damages as will adequately compensate him for the loss and injury which from the evidence you shall find he has suffered. The plaintiff should be made whole for his loss of time, his anxiety and suffering, and for his pecuniary losses and expenditures accompanying and caused by his arrest and imprisonment, including attorney-fees for counsel employed to defend him against such prosecution.

"14. If you should find from the evidence that William Higgins, either alone or in connection with other agents of the defendant company, corruptly and fraudulently resorted to the machinery of the law to oppress the plaintiff, it would be a case in which if you find for the plaintiff you might, if you chose, award exemplary damages.

"15. But although the criminal prosecution against the plaintiff complained of in this action was terminated in favor of the plaintiff, and he was wholly discharged therefrom, yet if you shall find from the evidence that such prosecution was malicious and without probable cause, within the rules already stated you may nevertheless, if you shall find that the defendants were not actuated by actual malice or evil intent toward the plaintiff, but only from insufficient testimony and without proper care and caution, then their good faith in commencing such proceedings may be considered by you in respect to the question of damages; for where one acts in good faith in an honest though mistaken effort to discharge a public or official duty, he ought not to be called upon to respond in more than compensatory damages.

"16. If you shall believe from the evidence that the throwing of the switch by the plaintiff, which caused the collision at Osage City, was an accident, and not done with the intention of doing a wrong, and if you further find that the criminal proceedings begun against him by the defendants were without probable cause, and with malice, then and in such case the injury done or supposed to be done to the property or person of the defendants or others should not be considered by you in assessing plaintiff's damages for such malicious prosecution — neither to increase nor diminish the same.

"17. You are the exclusive judges of the credibility of the witnesses, and of the weight of the evidence; and it is your province to determine what facts are proven and what facts as claimed are not proven by the evidence.

"18. If you find in favor of the plaintiff, you will assess his damages at such sum as you may deem proper under the

instructions already given you, not to exceed the amount claimed in the petition, namely, $10,000.

"19. If you find in favor of the defendants, a simple finding in their favor will be sufficient.

"20. The letter offered and read in evidence from the board of railroad commissioners to the general manager of the defendant railroad company affords no lawful grounds or excuse for the arrest and prosecution of the plaintiff for defendants. Said board of commissioners had no authority to direct any such prosecution, even if they had attempted or pretended to do so; but the letter seems to be a mere suggestion rather than a direction.

"21. Four forms of verdict will be prepared and handed to you : one suitable for a finding in favor of the plaintiff against both defendants; one in favor of plaintiff and against the defendant corporation alone; and one in favor of the plaintiff and against defendant Higgins alone, and the fourth suitable for a finding in favor of the defendants. When you shall have agreed upon a verdict, you will sign by your foreman, and return it into court."

The jury returned a verdict against the railroad company for $2,500, and found for William Higgins. The railroad company filed a motion for judgment on the verdict, on the theory that as the railroad company acted only through agents, and could only be bound by the acts of its agents within the scope of their authority, and as the jury had found that its agent Higgins had done no wrong, no liability attached to the company. The motion was overruled. A motion for a new trial was filed, alleging all statutory causes, and overruled. All exceptions were saved and noted, and the case brought here for review.

In this court two propositions were strongly insisted upon : First, that the verdict is illogical, absurd, and wrong; and second, that the facts constituting probable cause were undisputed, and the court erred in submitting that question to the jury.

*Geo. R. Peck, A. A. Hurd,* and *Robert Dunlap,* for plaintiff in error.

*C. M. Welch, S. S. Lawrence,* and *R. B. Welch,* for defendant in error.

Opinion by SIMPSON, C.:   I. The first complaint made by counsel for plaintiff error in their brief is, that the verdict of the jury is an illogical one.   The line of reasoning by which they arrive at such conclusion is about this: The plaintiff below sought to hold the railroad company liable for the act of its agent, William Higgins, under the doctrine of *respondeat superior*.   Higgins was joined with the railroad company as defendant in the action, both for this purpose and the additional reason that he was personally liable for the wrong committed.   The liability of the railroad company is predicated upon that of its agent, for whose act it was responsible.  Now as the jury found a verdict in favor of Higgins, thus saying that he committed no wrong, there is no liability of the agent to predicate that of the superior upon.   If the major premise of this proposition is true, there seems to be no escape from the conclusion.   The first inquiry then involves the construction of the pleadings in the case, to determine whether or not it is sought to hold the company liable solely for the act of its agent under the doctrine of *respondeat superior*.   Before judgment the most unfavorable construction is to be given the pleadings, but after judgment that construction must be given them which will best harmonize with the whole record.

The allegations of the petition in this respect are as follows:

"That the defendants procured the arrest of the plaintiff by said William Higgins as the agent, and at the instance and request of the defendant company, making and filing with L. J. Webb, a justice of the peace, an affidavit," etc.

In the answer of the railroad company it is alleged:

"Second, that on September 17, 1883, it did, through and by its proper officer, notify the board of railroad commissioners of the facts with reference to the plaintiff throwing a certain switch on the railroad of the defendant, and for which said plaintiff was subsequently arrested, at the time mentioned in the plaintiff's amended petition, and that said defendant requested instructions from said board of commissioners; that on the 21st day of September, 1883, said board did, in writing, request and direct this defendant to proceed to capture the plaintiff herein, and turn him over to the proper authori-

ties to be held accountable for his conduct, and in pursuance of such authority and direction of the board of railroad commissioners aforesaid, this defendant caused the complaint mentioned in plaintiff's amended petition to be made and filed; and the defendant says that said arrest was made so as aforesaid solely at the suggestion and request of the said board of railroad commissioners."

Higgins's answer is in substance the same as the railroad company's, with the additional averment "that he filed the complaint and caused the warrant to issue at the instance and request of the company."

In this state of the pleadings, there can be no successful contention against the primary liability of the railroad company. The petition charges that the criminal prosecution was instituted at the instance and request of the defendant company. The defendant company states in its answer, "this defendant caused the complaint mentioned in plaintiff's amended petition to be made and filed." Higgins the agent says in his answer that he filed the complaint and caused the warrant to issue at the instance and request of the company. The fact that the prosecution was begun at the instance and request of the railroad company, and that the company caused it to be instituted, is admitted by the pleadings. A tort which one directs or advises another to commit he is always responsible for. (Cooley on Torts, p. 534.)

The liability of the railroad company for the wrong in this case, if any wrong there was, is based upon its direct connection with the prosecution, not only as adviser, but because it directed the institution of it, caused it to be begun, and set it in motion. There is no question here of dependency of liability upon the subordination of the agent, because the agent acted under the express direction and in strict obedience to the orders of the company. The agent may be responsible for his participation in the wrong committed by the orders of the principal, but this is an independent question for the jury, and does not necessarily involve the liability of the principal. If in this case the railroad company had been the only defendant, and the petition and answer had contained the same allegations,

could there be any doubt about the liability of the company for the commencement of the prosecution? Then the case does not fall within the ordinary doctrine of *respondeat superior* in the sense in which it is assumed to fall by counsel for the plaintiff in error. The verdict is not illogical or absurd, for a jury could consistently say on the facts admitted by the pleadings that the railroad company having caused the institution of these proceedings, and its agent having done only as he was expressly directed to do by his superior, the consequences shall rest on the company alone. Probably the strict view of this question is, that as a railroad corporation can only act by its agents, when the head of a department directs one of its subordinates to do an act from the performance of which injury is done a third party, abstract justice requires that the corporation shall suffer the consequences that follow the obedience of the subordinate to his superior.

II. The question of probable cause was left to the jury, and counsel for plaintiff in error claim that the evidence in this case was undisputed, and it was therefore for the court to determine whether probable cause existed or not. This involves an examination and determination as to what the facts are, and what are the reasonable deductions from them. If

1. Probable cause; question for court; for jury, when.

the facts are not in dispute, the question is for the court; if they are disputed, the jury must be left to pass upon the existence or want of probable cause. Now, in the determination of this question, two propositions must constantly be kept in view: The first is, that the burden of proving the want of probable cause in this action was upon the plaintiff who alleged it; the second is, that the conduct of Foulks, the claim agent of the railroad, and the officer who ordered a criminal prosecution against

3. Criminal prosecution; conduct of complainant, how weighed.

Watson, "must be weighed in view of what then appeared to him to be the acts and declarations of Watson, and not in the light of subsequently appearing facts." (*Stewart v. Sonneborn*, 98 U. S. 194.) The very many things introduced for the purpose of establishing actual malice, and other issues, must not be taken into con-

sideration or allowed to have any bearing on the question of the existence or want of probable cause. The belief of Foulks as to the existence of probable cause, is to be determined by the state of facts existing before and up to the time of the arrest, and is not to be influenced by the other evidence in the case, or the state of facts developed subsequent to the arrest. Out of considerations of this character has grown an unbroken line of authorities establishing one of the most important and beneficial rules that govern in actions for malicious prosecutions. The rule is that in a case where there is a substantial dispute about facts, constituting the existence or want of probable cause, it is for the jury to determine what facts are proved, and for the court to say whether or not they amount to probable cause. It is therefore generally the duty of the court in such a case, when evidence is given tending to prove or disprove the existence of probable cause, to submit to the jury its credibility, and what facts it proves, with instructions that the facts found amount to proof of probable cause, or that they do not. The court should group the facts in the instructions, which the evidence tends to prove, and then instruct the jury that if they find such facts have been established, they must find that there was or was not probable cause. (*Johnson v. Miller,* [Iowa,] 17 N. W. Rep. 34; *Owen v. Owen,* 22 Iowa, 271; *Shaul v. Brown,* 28 id. 37; *Gee v. Culver,* [Ore.] 6 Pac. Rep. 775; *Hadrick v. Bishop,* 12 O. B. 275; *Castro v. De Uriarte,* 16 Fed. Rep. 93; *Stewart v. Sonneborn,* 98 U. S. 187; *Heyne v. Blair,* 62 N. Y. 19; *Sutton v. Johnson,* 1 Term Repts. 493.) This rule must not be made a pretext by which a question primarily for the court, is transferred to the jury. There must be a substantial dispute about the existence of probable cause before it can properly go to the jury, and if about the facts that are claimed to prove or disprove probable cause, there can fairly be said to be a dispute, a conflict of testimony; irreconcilable statements of witnesses; a strong flavor of improbability, then the jury are the sole judges of these, as of every other material fact in the case; but if the evidence on

2. Evidence; jury; facts, grouped in instructions.

this question, fairly considered and impartially weighed, produces in the mind of the court a reasonable conviction of the existence or want of probable cause, then it is the clear duty of the court to instruct the jury accordingly. The dispute must be of such character as to compel the court to weigh evidence, and determine the credibility of witnesses, before it ceases to be a question of law for the court and becomes an issue of fact for the jury. Whenever the evidence of the existence or want of probable cause produces in the mind of the court a reasonable doubt as to its proper determination, then it should be submitted to the jury. It is said in the case of *Stewart v. Sonneborn*, 98 U. S. 187, that in all cases in which the question of the defendant's belief of the facts relied on to prove want of probable cause is involved, what that belief was, is always for the jury to determine.

Proceeding to ascertain from the record whether or not there was such a substantial dispute about the facts tending to prove a want of probable cause, we shall first state what the evidence shows to be the material facts in the whole case, and then examine such facts as are alleged to have produced in the mind of Foulks an honest belief of the guilt of Watson of willfully and maliciously throwing the switch. The main facts are, that on the first day of September, 1883, at Osage City, on the line of the Atchison, Topeka & Santa Fé Railroad, and about two o'clock in the morning of that day, a passenger train going west on the main track left that track and ran into and collided with an extra freight train that was standing on a side track and headed to the east, severely injuring several of the employés of the company, and destroying some of the property. While the general course of the line of railroad is from the east to the west, at the depot and yards at Osage City, the course of the main track was from the northeast to the southwest, parallel with the main track for quite a distance, and on both sides of it were side tracks, one to the northwest called the north siding, and one to the southwest called the south siding. The main track and each of the side tracks were connected about midway of the side tracks by a

cross or spur track running diagonally across the main track from the side tracks, and connected with the main track by switches. This spur track was located some distance east of the depot. The general course of the line being east and west, trains going over the road were called "east-bound" and "west-bound" trains.. The extra freight train to whose crew Watson belonged was running from Emporia to Topeka. It had left Emporia with orders to side track at Osage City to let three extra freight trains pass, and to get orders about the passenger train. Arriving, it had stopped on the north siding, close to the spur or cross track, awaiting signals from the conductor to go ahead. Watson was the head brakeman on this train, and one of his duties was to throw switches ahead of it. He stated that—

"As soon as the three extras had passed on the main line, he went up to the switch and unlocked it, and took the pin out of the lever and sat down on the switch-block, facing the depot."

The depot was located some distance west of the switch-block upon which he was sitting, and hence when he sat down on the switch-block facing the depot he was facing west. This switch is located on the south side of the main track, and the freight train being on the north siding he could plainly see the depot, or at least that train would not obstruct his view. He sat down there on the switch-block facing the depot, waiting for his conductor to give the signal to the engineer of the freight train to move ahead, and to do this the train would have to leave the north siding, go onto the spur track, and from that onto the main track. He states that—

" While sitting there I went to sleep and must have turned over, for I was leaning back this way; I must have turned clear over; the first thing I heard, I never heard no train whistle; I don't know whether the train whistled or not; I heard a noise, and looked up and saw a headlight coming; Well, I jumped up —I thought it was our train pulling out— and throwed the switch. Well, after I did it, I could see the lights of the passenger train, and knew what I did, and tried my best to throw the switch under the baggage car, so that

50 — 37 KAS.

they would go on to the ties and stop.    I was dazed and frightened."

Throwing the switch let the passenger train from the main track onto the spur, and from there onto the north siding, when it collided with the freight train and did great damage and severely wounded the fireman on the passenger train, and hurt some other persons.    The distance from the switch to the north siding where the freight train stood headed to the east, was about three car-lengths.    Immediately after the collision occurred Watson ran toward the wreck and told both the engineer of the passenger and the conductor of the freight that he had thrown the switch under the supposition that the approaching train was the freight.    He assisted to carry the wounded man to the station house, hunted up a surgeon to attend him, and then disappeared.    Martin Myers, the engineer on the passenger train, says :

"Approaching Osage City yards, I saw the switch lights were all right for the main track; they were all burning all right for the main track.    As I neared the middle of the north siding there was a train standing on the siding, and about there is a spur or cross-track.    The engine of the freight train was standing near the spur, and as I approached the engine I saw that gentleman [Watson] there start from the engine and run directly across the track in front of me, about one or two car-lengths in front of me, and he grabbed the switch and threw it around and ran me right directly into the freight train that was standing on the siding.    I was unable to hold the train in such a short distance.    I applied the air and reversed the engine, but I was too close to the freight on the siding and went into them.    He was not at the switch as I approached.    He ran across the track from the opposite side of the switch, from the same side his train was standing on; he ran across the track with a lamp in his hand.    There was a rule in force then, and is now, and is on all roads that I am acquainted with in the United States, instructing brakemen that when the approaching train is expected, to keep entirely away from the switches and not unlock them until after the approaching train has passed."

Perdue, the conductor of the freight train, says :

" I had been to the office to get the orders for my train.    I

got the order, and started out to take it to my engineer, when this passenger train came in sight in the Osage City yards. I got opposite my way car, when I saw this brakeman give this passenger train signals to stop. When he did that, I stopped too; I knew there was something wrong; but I could not any more than say 'Jack Robinson' before they struck. It did not seem more than two seconds to me—just as quick as could be done. I did not see anybody throw a switch there that night, just before the passenger train came in. I saw the signal to stop. It looked to me like the light had left about the front of my engine or train. It looked like it had left my engine, but it was on the main track when signal was given. I was back of the engine about twenty cars."

This was all of the material evidence of the circumstances connected with the immediate cause of the wreck.

C. M. Foulks was the claim agent of the defendant railway company. It was a part of his duty as such claim agent to investigate the cause of all wrecks, look after the wounded, take charge of the damaged property, and report to the company how they occurred, their cause and results. He made an investigation in the case, and found this state of facts:

*First:* That Leon Watson was the employé who misplaced the switch.

*Second:* That a day or two prior to the wreck Watson had called for his time.

*Third:* That immediately after the wreck Watson had disappeared, and could not be found, although he caused a search to be instituted and caused inquiries to be made of other roads "if such a man was in their employ?"

*Fourth:* Myers, the engineer of the passenger train, had given to Foulks his version of the circumstances attending the misplacement of the switch, substantially as he testified.

*Fifth:* Perdue, the conductor of the freight train, had made a report about the wreck, and the cause of it, substantially as he testified.

*Sixth:* The witness, Frank Brown, had made a statement in presence of Foulks of the declaration of Watson on the street that "he had done the company up at Osage City, and would do it again," as Brown testified at the trial.

*Seventh:* Foulks had investigated the train sheets at division headquarters, and alleged to have found by these that the claim of Watson that the cause of falling asleep on the switch-block was by reason of continuous work which gave him no time to rest and sleep, was not supported by the reports.

Foulks, on the witness stand, swore that at the time he ordered Higgins to file a complaint and have Watson arrested, he had an honest belief of the guilt of Watson, produced by the facts above stated. On the other hand, it is in evidence that before the arrest, Watson's deposition had been taken in the case of Amick against the railroad company, in which action Amick, who was a fireman on the passenger train, sued the company for damages for an injury he received at the time the collision occurred at Osage City, and in that deposition he had given his version of the cause of the wreck in substance the same as his testimony on this trial.

The theory of the counsel for Watson was, in the pleadings and at the trial, that the search and arrest of Watson was to prevent him from testifying in the case of *Amick v. A. T. & S. F. Rld. Co.*, and not belief in his guilt. The correspondence between the railroad company and the board of railroad commissioners, shortly after the occurrence, is relied upon by both parties. The counsel for Watson claim that it presents a strong indication of the belief in the mind of Foulks at the time he addressed the letter to the board, as to the circumstances that caused Watson to misplace the switch, because in that written communication Foulks says, "An accident occurred caused by a brakeman by the name of Watson carelessly and negligently throwing a switch." The counsel for the railroad company claim that, as the correspondence stated that "Watson had escaped," and that "the railroad company would endeavor to effect a capture and turn him over to the board of railroad commissioners, to be dealt with according to law," and as the railroad commissioners advised "that the absconding brakeman be captured and turned over to the proper authorities of Osage county, to be held accountable for his conduct," the

fair construction of the correspondence is, that while Foulks had not technically described a criminal offense as having been committed by Watson, that was his evident meaning. There are perhaps other facts and deductions, relied upon by both parties, to prove the want and the existence of probable cause; but these are sufficient to show that there was such a substantial dispute about it that, under the rule hereinbefore cited, the question as to what facts were established by the evidence was for the jury to determine. But the facts were nowhere in the instructions grouped, and the jury were not told what facts they should consider in the determination of the question of probable cause. They were not instructed that the conduct of Foulks in this respect must be weighed by the facts that came to his knowledge from responsible and reliable sources before arrest, and not in the light of all the facts subsequently developed on the trial of the case; and hence we think that the question of the want or existence of probable cause was not fairly submitted to the jury, with the limitations and restrictions imposed by the rule, and that was material error to the prejudice of the plaintiff in error. The trial judge gives an admirable definition of probable cause, but fails to segregate the evidence on that question from the other evidence in the case, and leaves the jury to determine it in the light of the facts and circumstances subsequent to the arrest. This is error; and because of it, we recommend that the case be reversed, and remanded to the district court for a new trial.

By the Court: It is so ordered.

All the Justices concurring.